1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8

9  LAMAR D. PERRY,                           CV F   05-0837 LJO DLB HC

10              Petitioner,                  FINDINGS AND RECOMMENDATION
                                             REGARDING PETITION FOR WRIT OF
11       v.                                  HABEAS CORPUS

12                                           [Doc. 1]
     A.K. SCRIBNER,
13
                 Respondent.
14  _____/

15

16       Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

17  pursuant to 28 U.S.C. § 2254.

         <u>BACKGROUND</u>[1]
18
         Following a jury trial in the Fresno County Superior Court, Petitioner was convicted of 11
19
    counts including receiving stolen property (Cal. Penal Code § 496, subd. (a));[2] felon in
20
    possession of a firearm (§ 12021, subd. (a)(1)), robbery (§ 211); possession of methamphetamine
21
    (Health & Saf. Code § 11377, subd. (a)), and possession of marijuana (Health & Saf. Code §
22
    11357, subd. (b)).  (CT[3] 332-338; 394-403.)  Petitioner was sentenced to 36 years and 4 months
23
    in state prison.  (CT 607-617; RT[4] 2148-2150.)
24

25       _____

26       [1]  This information is derived from the petition for writ of habeas corpus and Respondent's answer.

27       [2]  All future references are to the California Penal Code unless otherwise indicated.

         [3]  "CT" refers to Clerk's Transcript on Appeal.
28
         [4]  "RT" refers to Reporter's Transcript on Appeal.

Petitioner filed a timely notice of appeal with the California Court of Appeal, Fifth Appellate District.  (Lodged Doc. A.)  On February 5, 2004, with one exception, the Court of Appeal affirmed Petitioner's conviction and sentence.[5]  (Lodged Doc. F.)

Petitioner timely petitioned the California Supreme Court for review.  (Lodged Doc. G.) The petition was denied on April 21, 2004.  (Lodged Doc. H.)

Petitioner filed the instant petition for writ of habeas corpus on June 27, 2005. Respondent filed an answer to the petition on February 7, 2006.  Petitioner did not file a traverse.

STATEMENT OF FACTS[6]

As an initial matter, Jesse Rodriguez testified while he was in the custody of the Fresno County jail after pleading guilty to approximately ten counts of armed robbery.  Rodriguez had already been prosecuted in federal court and was promised a sentence of no more than 27 years, in lieu of the more than 200 years he faced, in exchange for his testimony.  Rodriguez testified that Petitioner had a plan to earn some easy money and committed the robberies with him.  (RT 950-953.)  The two did do not discuss the robberies beforehand; there was simply an understanding that when Petitioner stopped the car in front of a store, Rodriguez would go in and rob it.  (RT 971, 981-982.)  The money was divided evenly between them.  (RT 979.)  The first robbery was committed in early 2001.[7]  (RT 952.)

Prosecution's Case of Charged Robberies[8]

Subway Sandwich Shop Robbery (Count 5)

On January 2, 2001, Petitioner and Rodriguez robbed the Subway Sandwich Shop on

---

[5]  The Court of Appeal reversed the count 5 robbery conviction and remanded to the superior court ordering it to impose an aggregate term of 34 years on the remaining counts.

[6] Because the factual circumstances surrounding Petitioner's convictions are not necessary for resolution of the instant petition, the Court will only briefly recite them.

[7]  On cross-examination, Rodriguez admitted that the first robbery was committed of a GNC store. Petitioner committed the robbery and a friend of Rodriguez's, Roy, was a passenger in the car.  A black Honda, that belonged to Petitioner's roommate, Toni Smith, was used in the robbery.  However, nothing was taken during the robbery.  (RT 1162-1165.)

[8]  The actual robberies themselves and Jesse's involvement in a majority of them were not disputed; several of the robberies were videotaped and at least one was shown on a local crimestoppers program prior to Jesse's arrest. (RT 600, 939, 1002.)

North Palm Avenue in Fresno, California.  Rodriguez stated that Petitioner drove the car to the store, and Rodriguez initially entered, ordered a sandwich, then left to go to his car to allegedly get some money.  The two exchanged guns and both went back inside.  The clerk was behind the counter on the telephone.  Rodriguez told her to get off the phone, then jumped over the counter while Petitioner remained on the other side.  (RT 952-955.)

Subway store clerk, Ramnjit Kaur, testified that Jesse jumped over the counter showed her a gun and demanded money, which Kaur refused.  Jesse obtained money from the two cash registers.  (RT 422-425, 492.)  The man was described as around 21 or 22 years old, approximately 5 feet 8 or 5 feet 9 inches in height, almost bald with a clean shaven face.  He appeared to be Hispanic and of medium build.  (RT 436-437.)

The other man who stood by during the robbery was described by Kaur as African-American; she stated that Petitioner was not the other man present during the robbery.  She stated that the man was thinner than Petitioner and bald, whereas Petitioner had hair.  (RT 441.)  Kaur was subsequently shown some suspect photographs, to which she did not recognize anyone.  Kaur stated "it's hard for me to recognize black people because mostly they look all alike to me."  She further stated that during the robbery the second man was standing far away from her and did not get a good look at his face.  (RT 442-443.)

Fresno Kragen Auto Parts Robbery (Count 6)

On January 5, 2001, Rodriguez and Petitioner robbed a Kragen Auto Parts store on West Olive in Fresno.  Rosemary Salinas was working at the Kragen store and noticed a man enter the store then leave a few minutes later.  (RT 684-689.)  Just before the store was closed, Salinas observed a man enter the store and approached clerk, Bennie Munoz, at the front register acting as though he was going to purchase a thermostat.  The man pointed a small dark-colored semi-automatic handgun at Munoz and demanded money.  (RT 816-817.)  The man left a few minutes later, and she observed Bennie Munoz run to the back of the store.  (RT 692-693.)  A few minutes later, he came out appearing to be frightened and told Salinas he had just been robbed.  (RT 694-695.)

Salinas stated that the man she saw was African-American, approximately 25 years old

with a stocky build.  (RT 697, 701.)  Salinas subsequently identified Petitioner's photograph

shown by police as looking similar to the man who robbed the store.  Because she did not see the

robber's hair because he was wearing a baseball cap, she was unable to compare Petitioner with

the robber.  Salinas was unsure whether Petitioner was the man who robbed the store because it

had been over a year since the robbery took place.  (RT 706-708.)  However, she estimated the

robber weighed 150 to 180 pounds.  (RT 711.)

Fresno West Shaw Mervyn's Robbery (Count 7)

On February 7, 2001, Rodriguez and Petitioner robbed the Mervyn's store on West Shaw

in Fresno.  Rodriguez testified that Petitioner drove and waited in the care while Rodriguez went

inside.  Rodriguez pulled a black semiautomatic handgun on Michael LaDesmna who working at

one of the cash registers, and after cocking the gun demanded money.  (RT 168-172.)  Rodriguez

left the store with the money and jeans.  (RT 171-172.)

Selma Wal-Mart Robbery (Count 8)

On February 10, 2001, Petitioner and Rodriguez robbed the Wal-Mart store in Selma,

California.  Petitioner parked his vehicle at the store and Rodriguez got out and went inside.

Rodriguez showed the store clerk a gun and demanded money.  The clerk panicked and asked

another clerk what to do, both women complied and gave Petitioner the money.  (RT 970-972.)

Rodriguez denied that he ever told anyone he would shoot them. (RT 1134-1135.)

Fresno Mervyn's Blackstone Robbery (Count 11)

On February 11, 2001, Petitioner and Rodriguez robbed the Mervyn's store on Blackstone

Avenue, in Fresno, California.  Rodriguez showed the clerk a black handgun he had obtained

from Petitioner.  (RT 965-966.)  Rodriguez after attempting to purchase two pairs of jeans, pulled

out the gun and demanded the money from the cash register drawer.  (RT 190-191.)  Rodriguez

left the store with the money and two pairs of jeans in a bag.  (RT 189-197, 203, 215, 469-473,

480.)

Krystal Jewelers Robbery (Counts 9 and 10)

On February 20, 2001, Rodriguez robbed at gunpoint, two store clerks the Krystal

Jewelers store in Selma, California.  Rodriguez tied the hands of one of the clerks because he

believed she was going to try and do something.  Because Rodriguez did not obtain that much money, he took some jewelry from the store.  (RT 501-507, 510, 526, 541-551, 554, 995-997.)

### Uncharged Robberies

### Visalia Clothes Time Robbery

On February 5, 2001, Rodriguez, entered the Clothes Time store, in Visalia, California, while Petitioner waited outside in the car.  Rodriguez showed a gun to the two store clerks and demanded money.  (RT 726-731, 734-739, 743, 759, 979.)

### Kragen & Dollar Tree Robberies

On February 8, 2001, Rodriguez displayed a small black or chrome handgun and robbed a clerk at a Kragen's store in Visalia, California.  (RT 643-650, 653, 671, 673, 977.)

On this same date, February 8, 2001, Rodriguez also robbed a clerk at a Dollar Tree store in Tulare, California, at gunpoint.  (RT 780-782, 932-935, 940, 979, 1204.)  Petitioner waited outside in the car.  (RT 982.)  Another store clerk testified that after Rodriguez left the store, he appeared to be looking for a vehicle, and then got into the back of a vehicle and drove away.  (RT 785-787, 790, 797, 808, 936.)  The car was described as an older dark gray or silver Honda, with tinted windows and a personal license plate stating "Mitchell" or "Michael."  (RT 787-789.)

### Madera Mervyn's Robbery

On February 16, 2001, Petitioner drove Rodriguez in the Honda to the Mervyn's store in Madera, California.  Petitioner parked outside while Rodriguez went inside the store.  Rodriguez again presented the clerk with items to purchase and showed a gun to the clerk demanding money.  (RT 564-569, 573, 590-601, 608, 619, 989, 991-992.)  After receiving the money, he calmly walked out of the store. (RT 581, 592-594, 602-604.)

One of the store investigators, Bruce Urbano, arrived at work that afternoon and noticed a black Honda Accord parked in a strange section of the parking lot where no one usually parked.  (RT 610-612.)  Urbano went to the camera room inside the store, his attention was drawn to a man selecting large amounts of clothing.  (RT 613.)  He suspected that the man may have been attempting to "grab-and-run."  (RT 614.)  Urbano observed the entire robbery from the camera room.  After the suspect left, he went and got the two clerks involved, and took them to the office

1   to write statements about the robbery.  (RT 614-616.)

2       <u>Tulare Mervyn's Robbery</u>

3       On February 17, 2001, Petitioner drove to the Mervyn's store in Tulare, California, and

4   Rodriguez went inside.  Rodriguez picked up a few items of clothing and showed the clerk a gun.

5   Rodriguez stated that they got a lot more money from the Mervyn's robberies than from the other

6   stores.  (RT 985-986.)  Rodriguez existed the store and realized that two people were following

7   him.  (RT 987.)  When he got to the car, Petitioner was asleep.  (RT 987.)  When Petitioner

8   awoke, two employees from the store were standing on each side of the car.  Petitioner put the

9   car in drive and ran into two trees.  Rodriguez displayed his gun to the employees and then

10  Petitioner put the car in reverse and drove off.  (RT 988, 1155-1156, 1215.)  The security guards

11  were not able to identify the driver.  (RT 1208-1209, 1329-1331.)

12      <u>Additional Testimony of Jesse Rodriguez</u>

13      Rodriguez fled from Fresno to San Jose for a week.  On the day he was planning to

14  return, he received a phone call from Petitioner, who stated that he also needed to get out of town

15  and asked for directions to the location of Rodriguez.  Rodriguez told Petitioner that he could not

16  come to that location because he was returning to Fresno to turn himself in.  (RT 1062-1063.)

17  Although Rodriguez returned to Fresno that day, he did not turn himself in to authorities.  (RT

18  1064-1065.)

19      Rodriguez was eventually arrested a few weeks later, and was interviewed by police

20  detectives from the various cities where the robberies had taken place.  (RT 1065-1067.)

21  Rodriguez admitted to his participation in the robberies and told them about Petitioner.  (RT

22  1067-1069.)  Rodriguez stated that Petitioner was also using drugs during this time.  (RT 1070.)

23  Rodriguez stated that he could not remember much of the details surrounding the robberies as he

24  was under the influence of drugs when they were committed.  Rodriguez admitted that he was

25  also dealing drugs during this time.  (RT 1190.)

26      Rodriguez stated that during each robbery, Petitioner supplied him with a black handgun,

27  and Petitioner was the driver of the vehicle during most of the robberies.  (RT 952-954, 960, 963-

28  969, 970, 974, 979-981, 985, 988, 992-994, 1067-1068.)  Petitioner kept the handgun in his room

on a shelf. (RT 966.) Rodriguez claimed that during the robberies the gun was not loaded and the bullets remained in Petitioner's bedroom. (RT 1002.) In the Fresno Kragen robbery, Rodriguez drove his brother Henry's car, and Petitioner went inside while Rodriguez waited in the car. (RT 959-960, 1048, 1146-1147.)

During the Krystal Jewelry store robbery, Rodriguez testified that he took some gold necklaces, a few bracelets and a watch. He initially kept the watch for himself, but later pawned it at a Fresno pawnshop. (RT 997.) He left the remainder of the jewelry with Petitioner in a shoe box in his closet. (RT 1052.)

Rodriguez told detectives that he never pointed the gun at anyone, despite the fact that several of the robbery victims testified to the contrary. (RT 209, 528, 555, 592-599, 729, 748, 1078, 1144, 1249.) Rodriguez testified that there were no promises or offers in exchange for his testimony in the case. (RT 1072.)

Rodriguez, unlike Petitioner, was unemployed during the string of robberies. Rodriguez stated that Petitioner would assist in the robberies after he completed his sales trips.[9] (RT 1085-1089.)

Petitioner's Arrest

In furtherance of the investigation, agent John Silveira of the Department of Justice's Bureau of Narcotics Enforcement conducted surveillance on an apartment at 2072 North Marks Avenue, apartment 117, in Fresno, California. Although Rodriguez was the focus of the investigation, he was not observed by agents. (RT 853-854, 881.)

Agents observed Petitioner driving a White Chevy Camaro. (RT 858.) He was followed from the apartment to a Kragen Auto parts store on West Clinton Avenue in Fresno, California, where he was arrested with what appeared to be methamphetamine and marijuana in his possession. (RT 859-861, 888-889.)

After Petitioner's arrest he was questioned regarding the whereabouts of Rodriguez. Authorities directed Petitioner to attempt to locate Rodriguez, and he contacted him through his

[9] Petitioner was employed as a sales representative, in good standing, from January 8-February 19, 2001. (RT 1381, 1446-1447, 1454.)

cell phone in San Jose, California.  (RT 893.)  The phone conversation was recorded.  (RT 897.)

In apparent reference to the handgun, Rodriguez told Petitioner, "[y]ou know where the shit's at.

Right?"  Petitioner appeared not to understand what Rodriguez was talking about, but after

Rodriguez said, "[t]he heat" Petitioner acknowledged that he understood.  Rodriguez then told

Petitioner that the gun was under the mattress and it should remain there.  (RT 1859-1860.)

Officers searched the Marks Avenue apartment.  (RT 1021-1022.)  Inside a closet in one

of the bedrooms a small cardboard box containing five necklaces, three still containing price

tags, were located.  The box also contained two similar detached tags and a small container

which held 17 medallions. (RT 1024.)  Officers also found various pieces of jewelry including

two gold necklaces, a bracelet two rings and an earring.  A .22 caliber semi-automatic handgun

was located underneath the mattress and eight rounds of ammunition were found on the

headboard.  (RT 1025-1026.)  The following day, the owner of Krystal Jewelers looked at the

jewelry items and stated that they were not taken from his store.  (RT 1040-1041.)

Petitioner acknowledged to Fresno police that he had driven Jesse to a Fresno Mervyns

and he came out with a bag, but Petitioner had no idea that he had robbed the store.  (RT 1926-

1927.)  Petitioner also admitted to driving Rodriguez to a the second Fresno Mervyns, the Selma

Walmart, Kragen's in Visalia, and a store in Madera.  (RT 1929-1933.)  Additionally, on one

occasion, Rodriguez had Petitioner drive him to a freeway mile marker to retrieve a bag

containing jewelry; Rodriguez gave Petitioner $300 for retrieving the bag.  (RT 1928.)  Petitioner

also told police that he did not know there was so much jewelry in the bedroom or that there was

a gun there.  (RT 1935.)

Petitioner acknowledged that he was with Rodriguez in Visalia or Tulare around February

8 and 17, 2001.  (RT 1222-1223, 1230-1236.)  Petitioner remembered hitting a curb when

driving away from the store in Tulare because Rodriguez had woke him up stating that two guys

were chasing him.  Rodriguez subsequently told Petitioner he had stolen a shirt, but he never said

anything about a robbery or showed a gun.  (RT 1227, 1232-1234, 1269.)  Petitioner stated that

he gave him money for all the rides.  (RT 1238.)

Defense

Rodriguez told his ex-wife, Melissa Barnes, that he was involved in the robberies and had shown Petitioner how to do it. (RT 1808, 1825.)  Barnes admitted that she and Rodriguez had done drugs together and she had a methamphetamine habit.  She acknowledged that when she was using drugs she made up stories, and she did not remember saying that Rodriguez told her someone in addition to Petitioner was involved in the robberies. (RT 1835, 1840-1841.)  Barnes acknowledged that she may have told police that Rodriguez's brother Henry Saldivar was involved in the robberies and she told District Attorney Investigator, Greg Noll, that Saldivar admitted to her that he was involved in some of the robberies. (RT 1825-1826, 1829, 1840, 1977-1978, 1981, 1985.)

Petitioner's ex-girlfriend Lisa Dove, testified that she had known him for more than ten years and the two dated in high school.  She met Rodriguez through Petitioner.  Petitioner asked Dove if she wanted to ride with them to San Jose because Rodriguez was in trouble.  (RT 1868-1869.)  They drove to San Jose dropped off Rodriguez then returned to Fresno.  Dove noticed that Rodriguez had a lot of money.  (RT 1870-1871.)  Neither Rodriguez nor Petitioner ever stated that Petitioner was in trouble.  (RT 1872-1873.)

Michelle Allen, best friend of Toni Smith, testified that she had known Petitioner for approximately two and a half years.  (RT 1882.)  She used methamphetamine with Petitioner.  She had met Rodriguez the month and a half prior to Petitioner's arrest.  She testified that she did not believe Rodriguez was a truthful person.  (RT 1883-1884.)  She took Rodriguez to a pawn shop where he pawned a "handful" of necklaces.  (RT 1886.)  Neither Rodriguez nor Petitioner ever told Allen that they had committed the robberies.  (RT 1887.)  She did see Rodriguez with a lot of cash, but never saw Petitioner with extra money.  (RT 1903.)

DISCUSSION

A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

9

529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.    Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations

1    omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

2        While habeas corpus relief is an important instrument to assure that individuals are

3    constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

4    (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

5    criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

6    Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

7    factual determinations must be presumed correct, and the federal court must accept all factual

8    findings made by the state court unless the petitioner can rebut "the presumption of correctness

9    by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115

10   S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

11   110 F.3d 1380, 1388 (9th Cir. 1997).

12   C.    Insufficient Evidence to Support Conviction of Robbery of Kragen Store

13       Petitioner contends that Jesse Rodriguez's testimony that Petitioner committed the

14   Kragen's robbery alleged in Count VI is insufficiently corroborated to sustain the conviction.

15   (Petition, at 5.)  This claim was presented to the Fifth District Court of Appeal (Lodged Doc. A),

16   which rejected the claim on the merits (Lodged Doc. F), and to the California Supreme Court

17   (Lodged Doc. G), which denied review.  (Lodged Doc. H.)

18       The law on insufficiency of the evidence claim is clearly established.  The United States

19   Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

20   federal court must determine whether, viewing the evidence and the inferences to be drawn from

21   it in the light most favorable to the prosecution, any rational trier of fact could find the essential

22   elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

23   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

24       Initially, Respondent argues that the requirement of corroboration is purely one of state

25   law and is not required under the Constitution.[10]  Subsection (c) of Section 2241 of Title 28 of

26

27       [10] Section 1111 provides in relevant part: "A conviction can not be had upon the testimony of an
     accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the
28   commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or
     the circumstances thereof."

the United States Code provides that habeas corpus shall not extend to a prisoner unless he is "in custody in violation of the Constitution." 28 U.S.C. § 2254(a) states:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to a judgment of a State court *only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States*.

(emphasis added).  See also Rule 1 to the Rules Governing § 2254 Cases in the United States District Court.  The Supreme Court has held that "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody . . ." Preiser v. Rodriguez, 411 U.S. 475, 484 (1973).  Thus, Petitioner's claim regarding the insufficiency of the corroboration is purely a state law question, and is not cognizable via section 2254.  In any event, as stated by the Court of Appeal, his claim is without merit.  The Fifth District Court of Appeal stated:

> An accomplice's testimony is adequate only if the record contains other evidence that corroborates that testimony by tending to connect the accused with the commission of the crime. (*People v. McDermott* (2002) 28 Cal.4th 946, 985-986, citing Pen. Code. § 1111.)  Corroboration that merely shows the circumstances of, or the commission of, the crime is insufficient.  (Id.)  "'Corroborating evidence is sufficient if it substantiates enough of the accomplice's testimony to establish his [or her] credibility. [Citation.]'" (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1206-1207.)  "'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]" . . . The evidence "is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth" [Citation.].)' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 556.)
>
> [¶] . . . [¶] As to the . . . Kragen robbery . . . Rodriguez testified he saw a gun in [Petitioner's] waistband on the day when [Petitioner] went inside a Kragen store for two or three minutes, left with a bag of money, and said "the clerk was scared and took off running."  A store employee who identified from police photographs a man who was in custody at the time of the robbery as "probably" the perpetrator and who identified [Petitioner] from those photographs as "maybe" the perpetrator testified she saw an African-American man enter the store, walk to the register, and leave the store at the same time as a cashier whom the African-American man robbed at gunpoint ran from the register to the back of the store.  On that count, the corroborating evidence connects [Petitioner] with the crime. [¶]  The determination of the trier of fact "on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime. [Citation.]" (*People v. McDermott, supra*, 28 Cal.4th at p. 986.)  On a record of sufficient corroborating evidence connecting [Petitioner] to the . . . Kragen robbery, we reject his argument as to that robbery.

(Lodged Doc. F, at 4.)

1    There is no federal constitutional requirement that accomplice testimony be

2  corroborated.  See United States v. Augenblick, 393 U.S. 348, 352 (1969) ("When we look at the

3  requirements of procedural due process, the use of accomplice testimony is not catalogues with

4  constitutional restrictions.").  Under current Ninth Circuit authority, accomplice testimony, alone,

5  is sufficient to "sustain a conviction unless it is incredible or insubstantial on its face,"or the

6  alleged violation resulted in a fundamental due process violation. United States v. Necoechea,

7  986 F.2d 1273, 1282 (9th Cir. 1993); United States v. Lopez, 803 F.2d 969, 973 (9th Cir. 1986);

8  Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000).  There is no evidence that Jesse

9  Rodriguez's testimony was incredible or insubstantial on its face or resulted in a fundamental

10  denial of due process.  Furthermore, "the credibility of witnesses is a question for the jury,

11  unreviewable on appeal."  United States v. Delgado, 357 F.3d 1061, 1068 (9th Cir. 2004).  As

12  such, the state courts' determination of this issue was not contrary to, or an unreasonable

13  application of, clearly established Supreme Court precedent.

14  D.    Admission of Uncharged Robberies Under Evidence Code Section 352

15    Petitioner contends that the trial court erred in admitting evidence of uncharged robberies

16  pursuant to California Evidence Code section 352.  This claim was presented to the Fifth District

17  Court of Appeal (Lodged Doc. A), which rejected the claim on the merits (Lodged Doc. F), and

18  to the California Supreme Court (Lodged Doc. G), which denied review.  (Lodged Doc. H.)

19    The Fifth District Court of Appeal rejected the claim as follows:

20        Candidly, acknowledging that Rodriguez's testimony that he and
       [Petitioner] robbed several other stores together is relevant to issues other than

21     criminal disposition, [Petitioner] nonetheless argues that the admission of that
       evidence and the absence of a cautionary instruction about that evidence were so

22     prejudicial as to constitute an abuse of discretion and a violation of due process.
       (See Evid. Code, § 1101, subd. (b).)  The Attorney General argues the contrary.

23     [¶]  Even if relevant to issues other than criminal disposition, evidence of past
       criminal conduct can be so prejudicial that admission of that evidence requires

24     extremely careful analysis. *(People v. Carpenter* (1997) 15 Cal.4th 312, 380;
       *People v. Ewoldt* (1994) 7 Cal.4th 380, 404; *People v. Thompson* (1980) 27

25     Cal.3d 303, 318, overruled on another ground in *People v. Williams* (1988) 44
       Cal.3d 883, 907, fn.7, as stated in *People v. Rowland* (1992) 4 Cal.4th 238, 260;

26     see Evid. Code, § 352.)  Since the standard of review is abuse of discretion,
       however, an appellate court can disturb the trial court's ruling only if admission of

27     that evidence "falls outside the bounds of reason." (*People v. Kipp* (1998) 18
       Cal.4th 349, 371, citing *People v. Ewoldt*, *supra*, 7 Cal.4th at 405 and *People v.*

28     *De Santis* (1992) 2 Cal.4th 1198, 1226.) [¶] Here, Rodriguez testified [Petitioner]

supplied a gun, drove a car, and waited outside while Rodriguez went inside a number of stores in the greater Fresno area and committed gunpoint robberies of store employees. [Petitioner] argues that the prosecutor "stressed the number of incidents to the jury" and emphasizes that the court gave no instruction on evidence of other crimes. (Cf. CALJIC No. 2.50) [¶] First, argument about the number of other robberies [Petitioner] and Rodriguez committed together constituted both appropriate and effective impeachment of [Petitioner's] statements disclaiming his knowledge of the charged crimes. That [Petitioner's] conduct in those robberies "'was no stronger and no more inflammatory'" than his conduct in the charged robberies "'decreased the potential for prejudice'" because the evidence of his past criminal conduct was not likely to inflame "'the jury's passions'" or create an emotional bias against him. (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 117, quoting *People v. Ewoldt*, *supra*, 7 Cal.4th at p. 405.) [¶] Second, the absence of an instruction on evidence of other crimes pales into insignificance on the record here. First, the court had no duty to give a sua sponte instruction on the limited admissibility of evidence of past criminal conduct. (*People v. Collie* (1981) 30 Cal.3d 43, 63.) [Petitioner] does not argue otherwise. Second, the prejudice that Evidence Code section 352 seeks to avoid is not the prejudice or damage to a defense that naturally flows from highly probative evidence. (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. [Citation.]" (*People v. Farmer* (1989) 47 Cal.3d 888, 912, overruled on another ground in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn.6.) Rodriguez's testimony that he and [Petitioner] robbed several other stores together did not prejudice [Petitioner] within the meaning of the statute. [¶] On that record, neither the admission of evidence that [Petitioner] and Rodriguez robbed several other stores together nor the absence of a cautionary instruction about that evidence constituted an abuse of discretion or a violation of due process.

(Lodged Doc. F, at 5-6.)

In a federal habeas action, review is limited to whether the petitioner's conviction violated constitutional standards. Engle v. Isaac, 456 U.S. 107, 119 (1982). Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle, 502 U.S. 62 (1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985). Nevertheless, with respect to the admission of prejudicial evidence, habeas relief is available if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 502 U.S. 62; Pulley v. Harris, 465 U.S. 37, 41 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990). However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991). "Only if there are *no* permissible inferences the

jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" Id. at 920, *quoting* Kealohapaoule v. Shimoda, 800 F.2d 1463, 1465 (9th Cir.1986).

Here, Rodriguez testified to several instances in which Petitioner drove a vehicle and waited outside, while Rodriguez went inside and robbed the various stores.  This evidence was relevant to show Petitioner's intent, motive, and knowledge, particularly in light of his claim that he was unaware of Rodriguez's actions when he went into the stores.  As reasonably found by the appellate court, the fact that Petitioner and Rodriguez committed several other robberies, beyond those charged by the State, effectively impeached Petitioner's statement that he had no knowledge of the charged robberies.  In fact, Petitioner did not deny his presence at the uncharged or charged robberies, rather he claimed lack of knowledge of Rodriguez's actions. (RT 1222-1223, 1226, 1232-1233, 1926-1928, 1930-1932.)  Thus, the issue to be decided was Petitioner's knowledge that the robberies were being committed and his intent and motive in driving Rodriguez to the various locations.  This reduces any danger that the jury may have doubted that he committed the charged offenses but convict on the belief he committed the uncharged offenses.  Further, as the appellate court reasonably found, the fact that Petitioner's involvement in the uncharged robberies was no greater than that involved in the charged robberies reduced any potential prejudice by inflaming the jury.  The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

E.      Jury Instructional Error - CALJIC 3.01

Petitioner contends that the trial court erred in giving CALJIC No. 3.01 because it permitted conviction upon a showing of aiding or abetting when both aiding and abetting are required to establish derivative liability.  (Petition, at 6.)  This claim was presented to the Fifth District Court of Appeal (Lodged Doc. A), which rejected the claim on the merits (Lodged Doc. F), and to the California Supreme Court (Lodged Doc. G), which denied review.  (Lodged Doc. H.)

The trial court instructed the jury with CALJIC No. 3.01 as follows:

1      A person aids and abets the [commission] [or] [attempted commission] of
a crime when he or she, [¶] (1) with knowledge of the unlawful purpose of the

2      perpetrator and (2) with the intent or purpose of committing, encouraging, or
facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates

3      the commission of the crime. [¶] [A person who aids and abets the [commission] [or] [attempted
commission] of a crime need not be personally present at the scene of the crime.] [¶] [Mere

4      presence at the scene of a crime which does not itself assist the commission of the crime does not
amount to aiding and abetting.] [¶] [Mere knowledge that a crime is being committed and the

5      failure to prevent it does not amount to aiding and abetting.]

6      (CT 456.)

7          The Fifth District Court of Appeal rejected Petitioner's claim on the following grounds:

8          [Petitioner] argues that disjunctive wording of a phrase in the standard
aiding and abetting instruction – "By act or advice aids, promotes, encourages *or*

9      instigates the commission of the crime" - violated his right to due process due to
the conjunctive wording - "advised *and* encouraged its commission" - of an

10     analogous phrase in the aiding and abetting statute.  (Compare CALJIC No. 3.01
with Pen. Code, § 31, italics added.)  The Attorney General argues the contrary.

11     [¶] . . . [¶] With commendable candor, [Petitioner] acknowledges the rejection of
his argument a decade ago by the Sixth Appellate District but argues that the

12     court's opinion failed to adequately address this argument.  (*People v. Campbell*
(1994) 25 Cal.App.4th 402, 410-414.)  On the premises that "aiding and abetting

13     are distinct concepts" and that "the plain language of Penal Code section 31
requires *both* elements," he faults the reasoning in *Campbell* that aiding and

14     abetting "are not distinct requirements" but "merely shorthand describing the
composite actus reus and mens rea" in CALJIC No. 3.01.  The First Appellate

15     District, Division Two, on the other hand, characterizes the reasoning in *Campbell*
as "a thoughtful opinion by Justice Wunderlich."  (*People v. Booth* (1996) 48

16     Cal.App.4th 1247, 1255.) [¶] *Booth* and *Campbell* both note the absence of any
case "'holding, or even suggesting, that "aid and abet" requires separate findings

17     concerning two distinct types of acts (assisting and encouraging) before a jury
may properly convict a defendant as an aider and abettor.'" (*People v. Booth*,

18     *supra*, 48 Cal.App.4th at p.1255, quoting *People v. Campbell*, *supra*, 25
Cal.App.4th at p. 411.)  The correct test is "'whether the accused in any way,

19     directly, or indirectly, aided the perpetrator by acts or encouraged him by words or
gestures.' [Citations.]" (*Booth, supra*, at p. 1255, quoting *Campbell*, *supra*, at p.

20     411.)  CALJIC No. 3.01 so instructed the jury.  We reject [Petitioner's] argument.

21     (Lodged Doc. F, at 6-7.)

22         As noted above, the Court of Appeal (the last reasoned opinion), specifically rejected

23     Petitioner's claim finding that as a matter of California law a conviction can be founded upon a

24     showing of aiding *or* abetting.  The state court's interpretation forecloses habeas corpus relief.

25     Clemons v. Mississippi, 494 U.S. 738 (1990), and Petitioner's claim should be denied.

26     ///

27     ///

28     F.     Jury Instructional Error - CALJIC No. 2.21.2

                                    16

Petitioner contends that the trial court erred in instructing the jury with CALJIC No. 2.21.2, which he claims allowed the jury to evaluate Jesse Rodriguez's testimony by a probability standard if they believed he was less than candid during his testimony.  This claim was presented to the Fifth District Court of Appeal (Lodged Doc. A), which rejected the claim on the merits (Lodged Doc. F), and to the California Supreme Court (Lodged Doc. G), which denied review. (Lodged Doc. H.)

The jury was instructed with CALJIC No. 2.21.2 as follows:

> A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others.  You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all of the evidence, you believe the probability of truth favors his or her testimony in other particulars.

(CT 438.)

The Fifth District Court of Appeal rejected the claim as follows:

> [Petitioner] argues that the standard instruction on the testimony of a willfully false witness violated his right to due process by allowing the jury to evaluate Rodriguez's "pivotal testimony" against him by a "probability standard" rather than by a reasonable doubt standard.  (CALJIC No. 2.21.2.)  The term "probability," he argues, implies the preponderance of the evidence standard.  The Attorney General argues the contrary. [¶] CALJIC No. 2.21.2 authorized the jury to "reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the *probability* of truth favors his or her testimony in other particulars." (Italics added.)  First, CALJIC No. 2.21.2 neither explains the reasonable doubt standard nor undermines other instructions that do so.  Second, the Supreme Court has squarely adjudicated [Petitioner's] argument against him.  (*People v. Nakahara* (2003) 30 Cal.4th 705, 714; *People v. Hillhouse* (2002) 27 Cal.4th 469, 493.)  We, too, reject his argument.

(Lodged Doc. F, at 7-8.)

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id.  The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  See United States v. Frady, 456 U.S. 152, 169 (1982) (*citing* Henderson v, Kibbe,  431 U.S. 145, 154 (1977)).  Furthermore, even if it is determined

1  that the instruction violated the petitioner's right to due process, a petitioner can only obtain

2  relief if the unconstitutional instruction had a substantial influence on the conviction and thereby

3  resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710

4  (1993) (whether the error had a substantial and injurious effect or influence in determining the

5  jury's verdict.).  See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of

6  demonstrating that an erroneous instruction was so prejudicial that it will support a collateral

7  attack on the constitutional validity of a state court's judgment is even greater than the showing

8  required to establish plain error on direct appeal."  Id.

9       As Respondent correctly submits, the California Court of Appeal rejected Petitioner's

10 claim because it found that CALJIC No. 2.21.2 did not explain the reasonable doubt standard or

11 undermine the other instructions that explained the reasonable doubt standard.  Further, the jury

12 was instructed with several other instructions regarding how to evaluate the witnesses testimony,

13 including CALJIC No. 2.13 (CT 432; prior consistent or inconsistent statements as evidence),

14 CALJIC No. 2.20 (CT 435; believability of witness), CALJIC No. 2.22 (CT 439; weighing

15 conflicting testimony), and CALJIC No. 2.90 (CT 451; reasonable doubt instruction).  The jury

16 was further instructed to view all of the instructions as a whole and in the light of all others.  (CT

17 421; CALJIC No. 1.01.)  In addition, when the trial court gave CALJIC No. 2.21.2 to the jury it

18 was phrased in general terms and Jesse Rodriguez's testimony was not emphasized or suggested.

19 Moreover, in closing arguments to the jury it was argued that accomplice testimony was to be

20 viewed with distrust and the jury was to weigh it with care and caution after examining it in light

21 of all the other evidence in the case.  (RT 2025-2026, 2068.)  The probability standard was not

22 argued or emphasized to the jury.  Viewed in the context of the entire trial, it cannot be said that

23 CALJIC 2.21.2 "so infected the entire trial that the resulting conviction violates due process."

24 Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973).  In sum, the record

25 supports the finding that CALJIC No. 2.21.2 was properly applied by the jury to determine only

26 whether the prosecution had met its burden of demonstrating Petitioner's guilt beyond a

27 reasonable doubt.

28 G.    Jury Instructional Error - CALJIC No. 17.41.1

Petitioner contends that the trial court erred when it instructed the jury with CALJIC No. 17.41.1 which informed them that they had a duty to inform on one another.  Petitioner contends the instruction violated his freedom of speech and association, his due process rights, right to a jury trial, and it tainted the entire jury deliberation process.  This claim was presented to the Fifth District Court of Appeal (Lodged Doc. A), which rejected the claim on the merits (Lodged Doc. F), and to the California Supreme Court (Lodged Doc. G), which denied review.  (Lodged Doc. H.)

The jury was instructed with CALJIC No. 17.41.1 as follows:

> The integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by these instructions.  Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law, or to decide the case based on any improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation.

(CT 238.)

In rejecting Petitioner's claim, the Court of Appeal held:

> Solely "for purposes of exhaustion of state remedies," [Petitioner] argues that CALJIC No. 17.41.1 violated his rights to due process and jury trial and the jurors' rights to freedom of association and freedom of speech. . . . [¶] CALJIC No. 17.41.1 does not violate the accused's right to jury trial.  (*People v. Engelman* (2002) 28 Cal.4th 436, 439, 441.)  [Petitioner] cites nothing in the record to show actual interference by the instruction with jury deliberations.  (Cf. Cal. Rules of Court, rule 14(a)(1)(C).)  By parity of reasoning with *Engelman*, we reject, on that record, his argument that the instruction violated his right to due process and the jurors' rights to freedom of association and freedom of speech.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

(Lodged Doc. F, at 8.)

As previously stated, to obtain federal collateral relief for errors in the jury charge, a petitioner must show that the "ailing instruction" by itself so infected the entire trial that the resulting conviction violates due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991). Even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

In this case, there is nothing in the record which supports Petitioner's allegation. There was no report of a juror refusing to deliberate or disregarding the law. There was no jury

1  deadlock and no holdout juror.  There is further no evidence that deliberations were improperly

2  chilled, that majority jurors improperly imposed their will on the minority, or that Petitioner was

3  denied his right to a unanimous jury and fair trial. In short, there is no reason to believe the

4  court's use of CALJIC 17.41.1 played any role in the jury's deliberations.  Therefore, Petitioner

5  has failed to demonstrate any prejudice resulting from this instruction.

6       Moreover, Petitioner has failed to establish a federal constitutional violation.  To date, the

7  Supreme Court has not held this instruction to be unconstitutional, and Petitioner does not point

8  to any Supreme Court authority which would bar the giving of this instruction.  The Ninth Circuit

9  addressed the instant claim in <u>Brewer v. Hall</u>, 378 F.3d 952, 957 (9th Cir.2004), affirming the

10  district court's denial of the same claim because there is no clearly established federal law

11  holding that CALJIC 17.41.1 violates an existing constitutional right.

12       Accordingly, the rejection of this claim by the state courts was neither contrary to or an

13  unreasonable application of clearly established Federal law, nor an unreasonable determination of

14  the facts in light of the evidence presented, and the claim should be denied. <u>See</u> 28 U.S.C.

15  § 2254(d).

16  H.   <u>Cumulative Error</u>

17       Petitioner contends that he was deprived of due process and a fair trial as a result of the

18  cumulative effect of the errors discussed above.  This claim was presented to the Fifth District

19  Court of Appeal (Lodged Doc. A), which rejected the claim on the merits (Lodged Doc. F), and

20  to the California Supreme Court (Lodged Doc. G), which denied review.  (Lodged Doc. H.)

21       The Court of Appeal rejected Petitioner claims as follows:

22       [Petitioner] argues that cumulative error requires reversal . . . . By
23  reversing the judgment of conviction and prohibiting a new trial on the count 5
    Subway robbery, we have cured the sole error in the record.  On a record with no
    cumulative error, [Petitioner's] cumulative error argument has no merit.  (See
24  *People v. Heard* (2003) 31 Cal.4th 946, 982.)

25  (Lodged Doc. F, at 8.)

26       The United States Supreme Court has not recognized a claim of cumulative error to grant

27  relief pursuant to a habeas corpus petition.  <u>See Lorraine v. Coyle</u>, 291 F.3d 416, 447 (6th Cir.

28  2002) ("Supreme Court has not held that distinct constitutional claims can be cumulated to grant

1  habeas relief.")   Although the Ninth Circuit recognizes such a claim,[11] in the instant case,

2  because there was no reversible error in this case, Petitioner is not entitled to habeas corpus relief

3  on his claim of cumulative error.  See United States v. Carreno, 363 F.3d 883, 889 n.2 (9th Cir.

4  2004) (noting that the cumulative error doctrine does not apply where there was no error);

5  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (holding where there are no errors, there

6  can be no cumulative error).  Consequently, Petitioner's claim fails.

7  I.     Insufficient Evidence to Support "Strike" Finding on Indiana Robbery Conviction

8          Petitioner contends that the "strike" finding based on his Indiana robbery conviction was

9  not supported by substantial evidence and his due process rights were thereby denied.

10  Specifically, Petitioner contends that his Indiana robbery conviction did not meet all of the

11  elements to support a California robbery.  This claim was presented to the Fifth District Court of

12  Appeal (Lodged Doc. A), which rejected the claim on the merits (Lodged Doc. F), and to the

13  California Supreme Court (Lodged Doc. G), which denied review.  (Lodged Doc. H.)

14          The law on insufficiency of the evidence claim is clearly established.  The United States

15  Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

16  federal court must determine whether, viewing the evidence and the inferences to be drawn from

17  it in the light most favorable to the prosecution, any rational trier of fact could find the essential

18  elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

19  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

20          In rejecting Petitioner's claim, the Court of Appeal held as follows:

21                 On the premise that the evidence is insufficient that his Indiana robbery
           prior included all the elements of a California robbery, [Petitioner] argues that a
22         resentencing without a new trial is imperative or, in the alternative, that a new trial
           is necessary after which a different result can ensue only if the prosecution were to
23         present additional evidence.  He identifies the problem with his Indiana robbery as
           "the absence of any requirement of an intent to permanently deprive another of
24         their [sic] property."  The Attorney General argues the contrary. [¶] . . . . To
           qualify as a serious felony prior, an out-of-state prior must include all of the

25

26  _____

        [11]  Whelchel v. Washington, 232 F.3d 1197, 1212 (9th Cir. 2000) (recognizing cumulative error standard but
27  relief granted based upon single error); see also Daniels v. Woodford, 428 F.3d 1181, 1214 (9th Cir. 2005) (granting
    relief based on cumulative error); Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002) (rejecting cumulative error
28  claim as meritless); Thomas v. Hubbard, 273 F.3d 1164, 1180 (9th Cir. 2001) (granting relief based on cumulative
    error), overruled on other grounds, Payton v. Woodford, 229 F.3d 815, 828 n.11 (9th Cir. 2002).

elements of a California serious felony.  (Pen. Code, §§ 667, subds. (a)(1), (d)(1), (d)(2), 1170.12, subds. (b)(1), (b)(2), 1192.7, subds. (c).)  In determining whether an out-of-state prior includes all of the requisite elements, a court can consider not only the elements of the out-of-state crime but also the entire record of the out-of-state prior.  (*People v. Avery, supra*, 27 Cal.4th at p.53.)  A robbery is a serious felony.  (Pen. Code, §§ 667, subds. (d)(1), (d)(2), 1170.12, subds. (b)(1), (b)(2), 1192.7, subds. (c).) [¶] . . . [¶] The record of [Petitioner's] Indiana robbery prior includes, inter alia, an information and an abstract of judgment showing his conviction of a robbery in which he took "$300 in money, a wallet and a pizza." (Ind. Code Ann. § 35-42-5-1 (Burns 2003).)  Our duty on a challenge to the sufficiency of the evidence is to "'view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)  On the facts and the law, we conclude that sufficient evidence supports the court's finding that [Petitioner's] Indiana robbery prior includes all of the elements of a California robbery.  (Pen. Code, §§ 667, subds. (a), (d)(1), (d)(2), 1170.12, subds. (b)(1), (b)(2), 1192.7, subds. (c).)

(Lodged Doc. F, at 9-11.)

The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  After Petitioner was found guilty by the jury, Petitioner waived jury trial on the prior convictions, and a court trial was held.  (CT 292-393; RT 2112-2126.)  In determining whether Petitioner suffered a prior "strike" conviction, i.e. a 1993 Indiana conviction for robbery, the trial court reviewed the prior prison packet containing the abstract of judgment (CT 405-409; Court's Exhibit No.2), and certified copies of the Indiana information and the minute order summarizing the guilty plea and sentencing.  (CT 410-414; Court's Exhibit No. 3.)

The Indiana information charged Petitioner with taking approximately $300 in money, a wallet and a pizza from Terry A. Laffoon while armed with a pipe.  (CT 410.)  The trial court initially expressed concern of whether Indiana law required that there be an intent to permanently deprive the individual of the items or whether the taking must be "against the will" of the victim. (RT 2112-2116, 2120-2126.)  Based on the case of Alexander v. State (Ind. App. 1973) 304 N.E.2d 329, stating that under Indiana law, the State had the burden of proving beyond a reasonable doubt that there was an intent to permanently deprive the owner of the property, the trial court resolved any ambiguity as to that concern. (RT 2113-2114.)  The trial court further found that based on the description of the offense as contained in the Indiana information, the

1   requirement that the taking be against the individual's will was likewise shown.  (RT 2114-2116,

2   2122-2126.)  Specifically, the trial court in reading the Indiana information stated:

3              Under Court's 3, it provides the following: "The undersigned being
       duly sworn, upon his oath, says that he is informed and believes that on or about
4       December 11th, 1992, in Vigo County, state of Indiana, William L. Allsup," A L L
       S U P, "and Lamar D. Perry did then and there, while armed with a deadly
5       weapon, to-wit, a pipe, knowingly take approximately $300 in money, a wallet,
       and a pizza from Terry A. Laffoon, " L A F F O O N, "by using and threatening to
6       use - - threatening use of force on the said Terry Laffoon, thereby resulting in
       bodily injury to the said Terry Laffoon in violation of IC" - - which I think stands
7       for Indiana Code  - - 35-42-5-1."  So the crime occurred on or about December the
       11th of '92.  And the conviction was on or about - - . . .
8              So in combination with Court's 2 - - 1, 2 and 3, Court is satisfied that the
       Defendant was convicted of a robbery with use of force and that the elements of -
9       - I feel all the elements of California robbery have been satisfied pursuant to
       CALJIC 9.40 with the exception of "against the will."  And I'm going to make a
10      finding that - - at least as it applies to this case, that that language is superfluous.
       And based on what I - - what I read about the facts of what happened in the
11      robbery, it's obvious that the robbery, in fact, was against the will of the victim.

12   (RT 2123-2124.)

13      As stated by the appellate court, in determining whether an out-of-state prior conviction

14   includes all the requisite elements, the trial court is free to consider and review not only all of the

15   elements of the out-of-state offense, but also the entire record of the prior conviction. People v.

16   Avery, 17 Cal.4th 49, 53 (2002).  Given the evidence before the trial court, there was sufficient

17   evidence to reasonably conclude that Petitioner's Indiana robbery conviction was a qualifying

18   "strike" conviction under California law.  The state courts' determination of this issue was not

19   contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

20   J.      Sentencing Error

21      Petitioner contends that the trial court erred when it used the same prior conviction both

22   as an element of the Penal Code section 12021 offense to impose a five-year enhancement, and to

23   increase the punishment for that offense under the Three Strikes law "is a direct violation."  This

24   claim was presented to the Fifth District Court of Appeal (Lodged Doc. A), which rejected the

25   claim on the merits (Lodged Doc. F), and to the California Supreme Court (Lodged Doc. G),

26   which denied review.  (Lodged Doc. H.)

27      As previously stated, a writ of habeas corpus is not available for alleged errors in the

28   interpretation or application of state law.  Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.

23

1985); see also Lincoln v. Stunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786

F.2d 1378, 1381 (9th Cir. 1986).  Petitioner is challenging the trial court's ruling based on a state

law determination of using the same prior conviction both as an element of the Penal Code

section 12021 violation and to enhance his sentence.  The Court of Appeal rejected Petitioner's

claim as follows:

> [Petitioner] argues that the rule in *People v. Edwards* (1976) 18 Cal.3d
> 796 permits the use of his Indiana robbery prior to prove an element of possession
> of a firearm by a felon but precludes the use of that prior either to invoke three
> strikes law sentencing (Pen. Code, §§ 667, subds. (b)-(j), 1170.12, subds. (a)-(d)
> or to impose a serious felony prior enhancement (Pen. Code, § 667, subd. (a)91)).
> The Attorney General argues to the contrary.
> In *Edwards*, the Supreme Court answered in the negative the question
> whether, under the former indeterminate sentencing law, the use of a prior to
> prove an element of possession of a firearm by a felon prohibits the use of the
> prison term the accused served on that prior to enhance a sentence for a new
> crime.  (*People v. Baird* (1995) 12 Cal.4th 126, 128; *People v. Edwards*, *supra*, 18
> Cal.3d at p. 800.)  In *Baird*, the Supreme Court answered in the negative the
> question whether the rule in *Edwards* prohibits the use of a prior to impose a
> prison term enhancement if the prior responsible for that prison term establishes
> an element of possession of a firearm by a felon.  (*People v. Baird*, *supra*, 12
> Cal.4th at p. 132.)  On the rationale that the enhancement statute in *Edwards* did
> not permit "the mere fact of a prior" to enhance a sentence, *Baird* observed that
> the rule in *Edwards* simply had "no direct bearing on the issue at hand."  (Id. at
> pp. 131-132.)
> Here, "the mere fact of a prior" can prove an element of possession of a
> firearm by a felon but, without more, can neither invoke three strikes law
> sentencing nor impose a serious felony prior enhancement.  Only a serious felony
> prior or a violent felony prior can invoke three strikes law sentencing.  (Pen.
> Code, §§ 667, subd. (d)(1), (d)(2), 667.5, subd. (c), 1170.12, subd. (b)(1), (b)(2),
> 1192.7, subd. (c).)  Only a serious felony prior can authorize the imposition of a
> serious felony prior enhancement.  (Pen. Code, § 667, subd. (a)(1).)  Here, as in
> *Baird*, the rule in *Edwards* simply has "no direct bearing on the issue at hand."
> (*People v. Baird*, *supra*, 12 Cal.4th at p. 131.)  We reject [Petitioner's] argument.

(Lodged Doc. F, at 11-12.)

Petitioner's claim is not cognizable via section 2254.  Petitioner is, in essence, urging a

new interpretation of state law.  This court must defer to the state court's interpretation and

application of its own laws, absent a finding that the interpretation is untenable or amounts to a

subterfuge in an attempt to avoid federal review of a constitutional violation.  Oxborrow v.

Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989).  The Court does not find that the state courts'

determination is untenable or amounts to a subterfuge; thus, this Court must defer to the state

courts' determination.

1    <u>RECOMMENDATION</u>

2           Based on the foregoing, it is HEREBY RECOMMENDED that:

3           1.      The petition for writ of habeas corpus be DENIED; and

4           2       The Clerk of Court be directed to enter judgment in favor of Respondent.

5           This Findings and Recommendations is submitted to the assigned United States District

6    Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

7    the Local Rules of Practice for the United States District Court, Eastern District of California.

8    Within **fifteen (15)** days after being served with a copy, any party may file written objections

9    with the court and serve a copy on all parties.  Such a document should be captioned "Objections

10   to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served

11   and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the

12   objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

13   636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

14   may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

15   Cir. 1991).

16          IT IS SO ORDERED.

17      **Dated:    July 6, 2007**          _____**/s/ Dennis L. Beck**_____

18                                          UNITED STATES MAGISTRATE JUDGE